IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. CAMERLINCK

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

DANIEL C. CAMERLINCK, APPELLANT.

Filed March 29, 2022.    No. A-21-434.

Appeal from the District Court for Douglas County: KIMBERLY MILLER PANKONIN, Judge. Affirmed.

Ryan M. Hoffman, of Bressman, Hoffman & Jacobs, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

PIRTLE, Chief Judge, and RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

## INTRODUCTION

Daniel C. Camerlinck pled no contest to one count of attempted first degree murder and one count of kidnapping. The Douglas County District Court sentenced him to consecutive sentences of 30 to 40 years' imprisonment for the attempted murder and 20 to 40 years' imprisonment for the kidnapping. Camerlinck claims that the district court imposed excessive sentences and that he was denied his right to effective assistance of counsel. We affirm.

## BACKGROUND

On January 13, 2020, the State filed an information charging Camerlinck with count 1, attempted first degree murder, a Class II felony, pursuant to Neb. Rev. Stat. §§ 28-303(1) and 28-201(4)(a) (Reissue 2016); and count 2, use of a deadly weapon (firearm) to commit a felony, a Class IC felony, pursuant to Neb. Rev. Stat. § 28-1205(1) (Reissue 2016).

- 1 -

On December 2, 2020, the State filed an amended information charging Camerlinck with the same count 1, attempted first degree murder, but changing count 2 to kidnapping, a Class II felony, pursuant to Neb. Rev. Stat. § 28-313 (Reissue 2016).

During a videoconference hearing on February 3, 2021, Camerlinck pled no contest to the two counts in the amended information. According to the factual basis provided by the State:

[O]n December 2 of 2019, law enforcement responded to [an address on] Ash Street where a victim, Dustin Moheng, was located in the yard at that location deceased from an apparent gunshot wound to the back of his head. There was also an additional gunshot wound appearing to enter his torso area.

Law enforcement began an investigation which led to interviews of several witnesses, [Camerlinck] himself and codefendants, regarding the events that had occurred leading up to . . . Moheng's death.

The night prior, [Camerlinck], . . . Moheng, and some codefendants were at [an address on] Woodcrest. They were acquaintances to one another. And . . . Moheng . . . had been staying at that location.

[Camerlinck] and Davion Wallace, a codefendant, had believed that [Moheng] was stealing from them, which led to an argument and some physical altercation the night prior.

. . . Moheng[] had left the Woodcrest location and ended up down in South Omaha near 13th and Vinton Street. . . . Camerlinck[] and the codefendants then were able to track . . . Moheng via Snapchat, an application, to his location down on 13th and Vinton where they intended to confront him about some missing marijuana.

[Camerlinck] and . . . Wallace then rode in another vehicle down to 13th and Vinton where they located . . . Moheng. They then removed him by threat of force at gunpoint from a vehicle, having . . . Moheng enter their vehicle, and returned back to the 127th and Woodcrest apartments essentially to figure out where the missing marijuana went.

While at that location, tempers calmed momently. . . . Moheng[] was able to leave the apartment again on foot. Shortly thereafter, . . . Wallace . . . followed . . . Moheng on foot with a firearm, even approached him near 51st and Ash, shot him one time in the back of the head leaving him on the ground.

. . . Wallace then returned to . . . 127th and Woodcrest and spoke with [Camerlinck] and other codefendants about the events that had occurred.

. . . Camerlinck[] and codefendants then returned to the body of . . . Moheng. [Camerlinck] took a firearm with him as well and approached the body. And per [Camerlinck's] words, he described [Moheng] as still gasping for air at that time, and [Camerlinck] fired at least one time at the direction of [Moheng's] torso, believing that he would strike him to, quote, put him out of his misery.

The investigation would reveal that [Camerlinck] missed that shot, and it went through [Moheng's] jacket and then out his jacket without striking him. However, [Moheng] would ultimately succumb from his injuries from the initial shot.

If this would proceed to trial, the state's evidence would be that [Camerlinck] was attempting a premeditated and malice act of killing . . . Moheng on the night in question after kidnapping him from 13th and Vinton with the codefendant.

Those events occurring in Douglas County, Nebraska.

The district court accepted Camerlinck's no contest pleas to the charges in the amended information and found him guilty of the same. The case was set for sentencing.

After a hearing on April 29, 2021, the district court sentenced Camerlinck to consecutive sentences of 30 to 40 years' imprisonment for the attempted murder and 20 to 40 years' imprisonment for the kidnapping. Camerlinck was given 513 days' credit for time served.

Camerlinck appeals.

## ASSIGNMENTS OF ERROR

Camerlinck assigns, consolidated, that (1) the district court erred when it imposed excessive and consecutive sentences and (2) he received ineffective assistance from trial counsel who failed to ensure that Camerlinck was competent when entering his pleas.

## STANDARD OF REVIEW

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). Abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019).

## ANALYSIS

### EXCESSIVE SENTENCE

Camerlinck was convicted of one count of attempted first degree murder, a Class II felony, and one count of kidnapping, also a Class II felony. A Class II felony is punishable by 1 to 50 years' imprisonment. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2020). Camerlinck was sentenced to consecutive sentences of 30 to 40 years' imprisonment for the attempted murder and 20 to 40 years' imprisonment for the kidnapping; his sentences were within the statutory range.

When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the crime. *State v. Lierman, supra.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.* Additionally, it is within the discretion of the trial court to impose consecutive rather than concurrent sentences for separate crimes. *State v. Artis*, 296 Neb. 172, 893 N.W.2d 421 (2017), *modified on denial of rehearing* 296 Neb. 606, 894 N.W.2d 349. This is true even when the crimes arise out of the same incident. *Id.* For a defendant who has been sentenced consecutively for two or more crimes, an appellate court

generally considers the aggregate sentence to determine if it is excessive. See *State v. Morton*, 310 Neb. 355, 966 N.W.2d 57 (2021).

Camerlinck was 21 years old at the time of sentencing. According to the presentence report (PSR), Camerlinck was single and had no children. He had completed the 11th grade and had been working at a temporary construction agency just prior to his arrest.

We will not recount Camerlinck's juvenile history, but his adult criminal history includes obstructing an officer in 2018 ($150 fine) and assault and battery in 2019 (30 days in jail). He also received a fine for careless driving in 2019. The details of his current offenses have been set forth previously.

The probation officer conducted a "Level of Service/Case Management Inventory." Camerlinck was assessed as a "[v]ery [h]igh" risk to reoffend. He scored "[v]ery [h]igh" risk in the criminogenic risk factor domains for education/employment, companions, procriminal attitude, and antisocial pattern. He scored "[h]igh" risk in the domains for criminal history, family/marital, leisure/recreation, and alcohol/drug problems.

According to the PSR, Camerlinck reported that his father had passed away, but that his father had problems related to marijuana and methamphetamine. Camerlinck's mother had bipolar disorder and depression and had ongoing methamphetamine problems. Camerlinck's parents had incidents of physical violence between them and divorced when he was 10 years old. He spent the last 2 years of his youth in foster care, as well as having stints at Boys Town and a youth program, before he aged out. Camerlinck's mental health screen results had "eleven positive responses to the seventeen questions posed," and the results "may be an indication of mental health issues for Mr. Camerlinck which may require further evaluation." There was information that Camerlinck had been diagnosed with a disruptive mood dysregulation disorder, attention deficit/hyperactivity disorder, and antisocial personality traits. Camerlinck reported being diagnosed with depression and having a history of anger management problems. He also had a history of drug and alcohol use, including abuse of prescription Xanax and daily marijuana use. He began selling marijuana by the time he was 12 years old. The probation officer noted that Camerlinck "may possess a lower intellectual level as evidenced by the combination of his cognitive functioning during this pre-sentence investigation interview and the fact that he does not possess his high school diploma or his G.E.D." The probation officer further noted that "[d]ue to the unstable nature of his upbringing, the defendant acknowledged that he began to associate with what could be considered a negative based crowd"; "[i]n fact, he reported being affiliated with a 'clique' called 'KMD['] which reportedly stands for 'Kill a Man Down.'"

At the sentencing hearing, Camerlinck's counsel stated that Moheng was dead because Wallace killed him, not Camerlinck. Counsel stated that Camerlinck did take responsibility for his role in the incident by entering his pleas, but counsel asked the district court to take Camerlinck's background into account. Camerlinck "was unfortunate enough to be the child of two meth users and he's got a highly dysfunctional background." Counsel asked the court to take into account Camerlinck's age and his "total lack of any kind of guidance" and to "fashion a sentence that would allow him to be released from prison before he reaches the age of thirty." Counsel stated that when Camerlinck "does go to the facility," "he's going to take full advantage of all educational opportunities and complete his GED" and he "wants to learn a trade"; "he's still got an eye on the future."

Camerlinck himself stated that he wanted to apologize "for everything that happened to Mo." Camerlinck worked with Moheng and they had conversed "about life"; Camerlinck wanted to help Moheng "get away from his drug use" and "try and help him become a better person." Camerlinck said, "And still to this day from the actions that happened that night it haunts me to this night that I failed my word. . . . I pray to God every single night and I ask him and Moheng for forgiveness." Camerlinck stated that he took Xanax the night of the incident and that "it made my mind like clustered and I couldn't think through." "But I know for a fact if I would have never took that Xanax I would have been able to stop every event that happened that night and Moheng would still be here."

The State argued that "although [Camerlinck's] shot did not produce the fatal blow to [Moheng], it showed his intent and his intentions from that night that he and [Wallace] intended to kill [Moheng] over a few dollars in marijuana." The State continued, "The investigation paints a very clear picture of what happened that night. It shows that [Camerlinck] was not only complicit, but arguably was the mastermind in the events that led to [Moheng's] death." Camerlinck and Wallace "intended on shooting [Moheng] or significantly hurting him after he had left the apartment that night," and "[t]hey went so far as to purchase an additional firearm, so that they would both have weapons available for when they encountered [Moheng] again." They decided to shoot or make an example out of Moheng, they tracked him down, and kidnapped him at gunpoint. Moheng was eventually able to leave, but Wallace followed him and shot him in the head, and later Camerlinck went to see the body and shot at Moheng again, believing that he was still alive. The State asked for "a significant prison sentence" and for the sentences to run consecutively.

A member of Moheng's family also made a statement to the district court describing how Moheng's death had affected his family and friends.

The district court stated that it had reviewed the PSR and considered all of the sentencing factors. The court addressed Camerlinck by stating:

> I think everyone here agrees that this was a senseless murder. A senseless crime. A senseless kidnapping. Between friends over a small amount of marijuana. The decisions made there weren't a decision that you made quickly, sir. There was a lot of thought, planning, premeditation[.] . . .
>
> Luckily, your bullet did not hit the victim in this case, but that's not because you didn't intend it to. You intended to kill him, because you thought he was still alive and you wanted to make sure that it was done. Kill a man down. And that's what you attempted to do. Very senseless.
>
> But, sir, these actions that you took on that day are very serious and the sentence imposed here has to take into account all of your actions, all of your part in this crime, and everything that you could have done to have stopped this, but instead furthered.

The court sentenced Camerlinck as set forth previously.

In his brief on appeal, Camerlinck contends that his sentences were an abuse of discretion because the district court failed to properly consider the "mitigating factors" of his age, mentality, social and cultural background, and lack of criminal history. Brief for appellant at 10. He notes that he was only 19 years old when the incident took place and "will be 60 years old at the time of his mandatory discharge date," that he took responsibility for his actions and showed remorse for

his crimes, and that he had a "nearly non-existent" criminal history. *Id.* at 8. He also notes that he had a difficult family background, was a "lower intellectual functioning young adult at the time the crimes were committed," and had a dual diagnosis "consisting of a mental disorder and substance abuse problem," *id.*, but "was not properly treated or medicated at both the time of the incident and the time of sentencing, *id.* at 9. Camerlinck also claims that it was an abuse of discretion to run his sentences consecutively because "the two charges were intertwined and arose from the same transaction." *Id.* at 7.

Having considered the relevant factors in this case, we find that Camerlinck's sentences were not excessive or an abuse of discretion and his sentences are therefore affirmed. See, *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020) (sentence imposed within statutory limits will not be disturbed on appeal absent abuse of discretion by trial court); *State v. Artis*, 296 Neb. 172, 893 N.W.2d 421 (2017), *modified on denial of rehearing* 296 Neb. 606, 894 N.W.2d 349 (it is within discretion of trial court to impose consecutive rather than concurrent sentences for separate crimes even when crimes arise out of same incident).

### INEFFECTIVE ASSISTANCE OF COUNSEL

Generally, a voluntary guilty plea or plea of no contest waives all defenses to a criminal charge. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). Thus, when a defendant pleads guilty or no contest, he or she is limited to challenging whether the plea was understandingly and voluntarily made and whether it was the result of ineffective assistance of counsel. *Id.*

Camerlinck has different counsel on direct appeal. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *Id.* Once raised, the appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. *State v. Lierman, supra*. A record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *State v. Theisen*, 306 Neb. 591, 946 N.W.2d 677 (2020).

To prevail on a claim of ineffective assistance of counsel, the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. See, *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Anderson*, 305 Neb. 978, 943 N.W.2d 690 (2020). To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *State v. Blaha, supra.* In a plea context, deficiency depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases. *Id.* When a conviction is based upon a guilty or no contest plea, the prejudice requirement for an ineffective assistance of counsel claim is satisfied if the defendant shows a reasonable probability that but for the errors of counsel, the defendant would have insisted on going to trial rather than pleading guilty. *Id.* The two prongs of the ineffective assistance of counsel test under *Strickland* may be addressed in either order. *State v. Blaha, supra*.

Camerlinck claims he received ineffective assistance from trial counsel who failed to ensure that Camerlinck was competent when entering his pleas.

A person is competent to plead or stand trial if he or she has the capacity to understand the nature and object of the proceedings against him or her, to comprehend his or her own condition in reference to such proceedings, and to make a rational defense. *State v. Dunkin*, 283 Neb. 30, 807 N.W.2d 744 (2012). The test of mental capacity to plead is the same as that required to stand trial. *Id*. A defendant can meet the modest aim of legal competency, despite paranoia, emotional disorders, unstable mental conditions, and suicidal tendencies. See *State v. Hessler*, 282 Neb. 935, 807 N.W.2d 504 (2011). The fundamental question is whether the defendant's mental disorder or condition prevents the defendant from having the capacity to understand the nature and object of the proceedings, to comprehend the defendant's own condition in reference to such proceedings, and to make a rational defense. *Id*. In order to demonstrate prejudice from counsel's failure to investigate competency and for failing to seek a competency hearing, the defendant must demonstrate that there is a reasonable probability that he or she was, in fact, incompetent and that the trial court would have found him or her incompetent had a competency hearing been conducted. *State v. Dunkin, supra*.

Camerlinck argues that his PSR indicated a "lower intellectual functioning," a dual diagnosis that included a mental health disorder, and that he did not always take his medication. Brief for appellant at 12. At the plea hearing when asked if he understood everything going on during the entry of his plea he responded, "Yes, Your Honor, for the most part." And he also stated that he did not always take his medications. Camerlinck argues that "his response indicated clear confusion as to his situation at hand," and his trial attorney "should have conducted a competency evaluation prior to [his] entry of plea hearing." *Id*. at 12.

At the plea hearing, the following colloquy took place.

THE COURT: Have you ever been treated for a mental illness or do you now suffer from any type of mental or emotional disability?

THE DEFENDANT: When I was in the foster system, they had evaluations that I did, and there was, like, a thousand questions. And they diagnosed me with depression. That was one that I know for sure.

They said I had -- like, I don't know how to describe it, but it's like -- like, it was just being troubled with other people, like, with trust and how to interact with other people.

THE COURT: Were you prescribed medication as a result of these diagnoses?

THE DEFENDANT: They tried to give me some for depression. I was taking it for a while, and I just stopped taking it.

THE COURT: Okay. Are you taking anything now at Douglas County Corrections?

THE DEFENDANT: No, Your Honor. I was at one point, but I'm off of it.

THE COURT: Okay. But you're not taking anything at this time?

THE DEFENDANT: No, Your Honor.

THE COURT: And are you feeling that you are clearheaded and are understanding everything that is going on?

THE DEFENDANT: Yes, Your Honor, for the most part.

THE COURT: What -- do you have concerns?

THE DEFENDANT: Just, you know, the normal stress and the normal depression of being here in the situation I'm in.

THE COURT: Yeah, I understand.

[Defense counsel], you've had plenty of opportunities to visit with your client? . . . .

[Defense Counsel]: Your Honor, to answer your question, I met with Mr. Camerlinck yesterday afternoon to discuss exactly what we're doing here today.

THE COURT: And do you have concerns about your client's mental status and his ability to be able to proceed today? Or do you have any concerns about competency?

[Defense Counsel]: I believe that Mr. Camerlinck knows what's going on today. I don't think there is anything mentally that would preclude him from understanding.

THE COURT: So in your dealings with your client and in your experience, your opinion is that your client is competent and is able to proceed today; is that correct?

[Defense Counsel]: My client is competent, yes. Sorry, Your Honor. . . .

THE COURT: . . . [D]oes the state to [sic] wish to put anything further on the record regarding that issue?

[The State]: No, Your Honor.

Camerlinck also confirmed that he understood his constitutional rights and that he still wished to plead no contest.

Despite Camerlinck's assertion to the contrary, there is nothing in the record to suggest that he did not understand the object or nature of the proceedings or his own condition in reference to the proceedings. When the district court asked if he was "feeling . . . clearheaded and . . . understanding everything that is going on," he responded, "Yes, Your Honor, for the most part." And when the court explored that response further and asked about his concerns, Camerlinck responded, "Just, you know, the normal stress and the normal depression of being here in the situation I'm in." Camerlinck's response in no way suggests that he was not legally competent. And although the probation officer noted that Camerlinck "may possess a lower intellectual level as evidenced by the combination of his cognitive functioning during this pre-sentence investigation interview and the fact that he does not possess his high school diploma or his G.E.D.," there was no suggestion that Camerlinck was not legally competent. Accordingly, Camerlinck's claim of ineffective assistance of trial counsel fails.

CONCLUSION

For the reasons stated above, we affirm Camerlinck's sentences. Additionally, Camerlinck's ineffective assistance of trial counsel claim fails.

AFFIRMED.